Patrick J. Neligan, Jr.
Texas State Bar No. 14866000
John D. Gaither
Texas State Bar No. 24055516
**NELIGAN LLP**
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5300
pneligan@neliganlaw.com
jgaither@neliganlaw.com

Proposed Counsel for J. Hilburn, Inc.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **IN RE:** | § | **CHAPTER 11** |
| | § | |
| **J. HILBURN, INC.,[1]** | § | **CASE NO. 20-31308-hdh11** |
| | § | |
| **DEBTOR** | § | |

## DECLARATION OF DAVE DEFEO IN SUPPORT OF CHAPTER 11 PETITION AND CERTAIN FIRST DAY PLEADINGS

1.      My name is Dave DeFeo.  I am Chief Executive Officer of J. Hilburn, Inc. (the "Debtor"), the debtor-in-possession in the above-captioned bankruptcy case (the "Bankruptcy Case").  In this capacity, I oversee and am generally familiar with the Debtor's day-to-day operations, business and financial affairs, books and records.

2.      On April 30, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, (the "Bankruptcy Code").[2]  The Debtor continues to operate its business as a debtor in possession under Sections 1107 and 1108.

---

[1] The last four digits of the Debtor's taxpayer identification number are 4288.
[2] All of the statutory references contained in this Declaration will be to the Bankruptcy Code, unless otherwise indicated.

3.      To enable the Debtor to minimize the adverse effects of the commencement of the Bankruptcy Case on its business, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "First Day Motion").  The First Day Motions seek relief intended to allow the Debtor to perform and meet those obligations necessary to fulfill its duties as a debtor-in-possession in the Bankruptcy Case.  I am familiar with the contents of each of the First Day Motions (including the exhibits thereto), and I believe that the relief sought in each of the First Day Motions:  (a) is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.  I further believe that, absent immediate access to cash collateral and post-petition financing, and authority to make certain essential payments and otherwise continue conducting ordinary course business operations as described and requested in the First Day Motions, the Debtor would suffer immediate and irreparable harm to the detriment of its estate, creditors, and other stakeholders.

4.      I submit this Declaration in support of the First Day Motions.  Except as otherwise indicated, all of the facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, or information supplied to me by other members of the Debtor's management and the Debtor's professionals.  I am authorized to submit this Declaration on behalf of the Debtor, and if called on to testify, I could and would testify competently to the facts set forth herein.

## I. THE DEBTOR'S BUSINESS AND OPERATIONS

### A.      Overview of the Debtor's Business

5.      The Debtor is one of the nation's leading purveyors of custom-made menswear. The Debtor utilizes luxury fabrics predominantly from Italy to create personalized, made-to-

measure garments for each client's fit and specification. The Debtor operates through a nationwide network of more than 1,800 independent stylists who offer personal fittings and styling sessions at their clients' convenience. For example, a stylist might schedule a styling session at a busy professional's home or office at which the client first selects materials and styles he wishes to purchase. The stylist will then take the necessary measurements and arrange for the manufacture of the garments through the Debtor's manufacturing partners in Portugal and Asia. Once the garment has been produced, the stylist will deliver the garment to the client in person to assure it meets the client's expectations. This direct-sales model leverages the Debtor's nationwide network of stylists and enables the Debtor to efficiently provide a luxury retail experience without the overhead of traditional brick-and-mortar stores and retail staff.

6.      As of the Petition Date, the Debtor had 41 employees that provide product design and manage the Debtor's operations from its corporate headquarters in Dallas, Texas.[3] The Debtor also maintains four sales and fitting studios in Dallas, New York City, Boston, and Bellevue, Washington, all of which are currently closed as a result of the COVID-19 pandemic. The Debtor operates a distribution and warehouse facility in Carrollton, Texas.

**B.      Debtor's Prepetition Debt and Capital Structure**

7.      Prior to the Petition Date, the Debtor was indebted to Silicon Valley Bank ("SVB") in the approximate principal amount of $6.1 million. The Debtor's outstanding indebtedness to SVB consisted of (i) a senior term loan in the approximate principal amount of $3.1 million and (ii) a fully-drawn revolving line of credit in the approximate amount of $3 million. The amounts owed to SVB are secured by a first priority security interest in substantially all of the Debtor's assets. The Debtor's revolving line of credit is further collateralized by cash deposits at SVB in

---

[3] The Debtor substantially reduced its employee headcount on April 1, 2020, including furloughing 10 employees who may be re-hired.

the amount of $3 million posted by certain third parties including one of the Debtor's shareholders.[4] The Debtor used the proceeds of the SVB loans to refinance existing debt and to fund the Debtor's operations. The Debtor maintains its primary operating and deposit accounts at SVB. Prior to the Petition Date, SVB consensually offset the third-party cash collateral accounts to reduce the Debtor's outstanding indebtedness to approximately $3.1 million as of the Petition Date.

8.       The Debtor is also indebted to Escalate Capital Partners SBIC I, L.P. ("Escalate") in the approximate principal amount of $2.74 million plus accrued but unpaid interest. The Escalate debt is subordinated to SVB's debt pursuant to the terms of a subordination agreement among SVB and Escalate  The amounts owed to Escalate reflect the balance due on a $10.5 million loan used to capitalize the Debtor in 2014.

9.       The Debtor is also indebted to certain holders of convertible promissory notes (the "Notes") in the principal amount of $12.75 million plus accrued but unpaid interest in the approximate total amount of $7.5 million. The Notes were issued to South China (Jersey) Holdings Limited (current total balance approximately $10.62 million), Battery Ventures VIII, L.P. ($8.40 million), and Bridgescale Partners, L.P. ($1.40 million), three of the Debtor's largest shareholders (collectively the "Noteholders"), in 2015 and 2019. The amounts owed under the Notes are unsecured and are subordinated to the amounts owed to SVB and Escalate pursuant a subordination agreements among the Noteholders and SVB and Escalate, respectively. The Debtor used the proceeds of the Notes to retire existing promissory notes and fund the Debtor's working capital needs.

---

[4] The deposits were posted by TAG Holdings, Inc. and Battery Ventures VIII, L.P. in the amount of $1.5 million each.

10.     As of the Petition Date, the Debtor owes approximately $8.6 million in outstanding unsecured trade debt, the overwhelming majority of which is owed to three major creditors: TAL Global Alliances (approximately $6.55 million), which manufactures the majority of garments sold by the Debtor; Crialme (approximately $806,000), which manufactures suits sold by the Debtor; and UPS (approximately $700,000), which the Debtor utilizes to receive and deliver its products. The Debtor is largely current with its other trade vendors.

## C.     Events Leading to the Debtor's Bankruptcy Filing

11.     In the year prior to the Debtor's bankruptcy filing, the Debtor's senior management has been focused on implementing a new management infrastructure, refining the Debtor's product offerings, recruiting and retaining stylists, reducing operational costs, and engaging with customers. Through February 2020, these efforts had delivered substantially improved financial performance year-over-year. For example, the Debtor's EBITDA in October 2019 through February 2020 was significantly improved compared with the same months the prior years. In addition, the Debtor achieved a record sales volume in December 2019. Based on these metrics, the Debtor believes its core business model is sound and that it was trending toward significantly improved financial performance in 2020. Despite this improved performance, however, the Debtor's substantial debt service obligations constrained its liquidity and weighed on its operations.

12.     Like the overhwleming majority of luxury retailers, the COVID-19 pandemic suddenly and dramatically affected the Debtor's operations. Since early March, and coinciding with the exponential spread of COVID-19 in the United States, the Debtor's daily sales volume has dropped precipitously. In March 2020, the Debtor's daily sales fell by approximately 53% compared to March sales one year ago, with a 74% reduction in sales volume during the last two weeks of the month. April sales have also fallen by approximately 63% year over year. As a result

of this rapid reduction in revenue, the Debtor suffered immediate liquidity constraints that impaired its ability to satsify its ongoing operational expenses, including payroll and payments to critical vendors. Although the Debtor believes its core business model is sound and expects that sales volume will increase as the COVID-19 pandemic recedes, the substantial uncertainty regarding the length of the pandemic and its lasting economic effects make a prompt return to pre-pandemic sales levels unlikely.

13. In response to the sudden and unexpected drop in sales, the Debtor acted quickly to reduce its ongoing expenses and conserve cash through the extension of payables. The Debtor reduced its employee headcount by 38% and temporarily reduced salaries of all remaining employees earning more than $50,000 annually. The Debtor requsted and received abatements of rent from certain landlords and immediately engaged SVB and Escalate to request a forbearance of monthly payments. Even with these expense reductions, however, the Debtor projects that it will be unable to meet its operating expenses without additional investment.

14. To avoid the abrupt shut down of the Debtor's operations, the Debtor's management has literally worked around the clock to reduce expenses and secure additional financing. Because of liquidity constraints relating to its existing debt service obligations, the Debtor had been actively seeking financing since early 2020. As of the Petition Date, the Debtor had spoken or met with at least 10 potential sources of financing and investment banks, none of whom were willing or able to provide the investment necessary to sustain the Debtor's operations. Unfortunately, the Debtor's ability to source additional capital was itself significantly affected by current financial markets, health and economic conditions, and the resultant nervousness and conservatism of potential investors. The Debtor also sought disaster relief loans from the Small Business Administration and funding under the federal Paycheck Protection Program enacted as

part of the recently-passed Coronavirus Aid, Relief, and Economic Security Act. As of the Petition Date, however, the Debtor had not been able to take advantage of these programs or otherwise obtain the funding necessary to continue operating without further restructuring.

**D.    Restructing Support Agreement and Proposed Plan of Reorganization**

15.    Although the Debtor was unable to source additional capital on the open market, in early April an affiliate of TAL Global Alliances, the Debtor's largest trade vendor, offered the Debtor a lifeline. After several weeks of negotiations, The Apparel Group, Ltd. ("TAG"),[5] based in Lewisville, Texas, has offered to fund a recapitalization and reorganization of the Debtor via Chapter 11 of the Bankrutpcy Code. TAG's proposal is set forth in, and subject to the terms and conditions of a, prepetition Restructuring Support Agreement (the "RSA"), dated as of April 30, 2020, by and among the Debtor, SVB, Escalate, the Noteholders, and TAG and certain of its affiliates holding claims agains the Debtor. A copy of the RSA is attached hereto as **Exhibit A**.

16.    Under the RSA, TAG has agreed to sponsor a plan of reorganization (the "Plan") that will provide for (i) the consensual satisfaction of SVB's claim, (ii) a distribution of "upside participation certificates" ("UPCs") to Escalate and the Noteholders that permit those parties to potentially share in the proceeds of a sale or othe liquidity event of the reorganized Debtor, (iii) payment in full of the Debtor's ongoing trade vendors, and (iv) a large distribution to any remaining non-trade general unsecured creditors, of which the Debtor expects there to be very few if any. In exchange, TAG will receive 100% of the newly issued equity in the reorganized Debtor. By substantially deleveraging the Debtor's balance sheet while paying ongoing trade vendors in full, the Plan will ensure that the Debtor is able to continue as a going concern, preserve the jobs of more than 1,800 employees and independent stylists, and maintain valuable economic

---

[5] TAG is also an affiliate of South China Holdings (Jersey) Limited, which is both a Noteholder and a preferred stockholder in the Debtor by virtue of previous investments in the Debtor.

relationships between the Debtor and its vendors. The Plan will also allow Escalate and the Noteholders an opportunity for recovery on account of their substantial prepetition investments in the Debtor.

17. More specifically, the RSA provides for the following Plan treatment to the Debtor's major stakeholders:

| **TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN** | | |
|---|---|---|
| **Type of Claim** | **Treatment[6]** | **Impairment / Voting** |
| **DIP Financing Claims** | In full satisfaction of each allowed DIP Financing Claim, the DIP Lender will (a) together with the Sponsor, receive a pro rata share of the New Common Shares in the Reorganized Debtor or (ii) receive such other treatment agreed upon between the Debtor, the DIP Lender and the Sponsor. | N/A |
| **Administrative Claims** | Except to the extent that a Holder of an allowed Administrative Claim and the Debtor agree to less favorable treatment for such Holder, each Holder of an allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |
| **Priority Tax Claims** | In full satisfaction of the allowed Priority Tax Claims, each Holder of an allowed Priority Tax Claim will be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | N/A |
| **Other Secured Claims** | In full satisfaction of each allowed Other Secured Claim, each Holder thereof will receive: (a) payment in full in cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Other Priority Claims** | Except to the extent that a Holder of an allowed Other Priority Claim and the Debtor agree to less favorable treatment for such Holder, in full satisfaction of each allowed Other Priority Claim against the Debtor, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired; *provided*, *however*, that Holders of allowed Claims under Section 507(a)(7) of the Bankruptcy Code shall receive the treatment provided for in the first day order addressing such Claims. | Unimpaired; deemed to accept. |

---

[6] All payments or deliveries contemplated as part of the specified treatment for any Claim shall be made on the Plan Effective Date or as soon as reasonably practicable thereafter, except as expressly stated herein.

| SVB I Claims | In full satisfaction of each allowed SVB I Claim, each Holder thereof will receive (i) an amount in cash equal to $1,000,000, which shall be paid within one business day after entry of the Interim DIP Order, or (ii) if such payment is not permitted by the Bankruptcy Court to be made as set forth in subsection (i) above, an amount in cash equal to (a) $1,000,000 plus (b) interest of $239.69 for each day from and including the day on which the Bankruptcy Court enters the Interim DIP Order that does not permit payment in accordance with the foregoing clause (i) until the date on which each Holder of an SVB I Claim actually receives payment in cash equal to $1,000,000 plus interest accrued as set forth above, which aggregate amount will be paid upon the earlier of (x) one business day after the date of entry of an order by the Bankruptcy Court authorizing such payment, and (y) thirty one (31) days following the Petition Date; *provided* that any deficiency Claim on account of the SVB I Claim shall be treated as a General Unsecured Claim for voting purposes, but there shall be no distribution on account of such Claim. | Impaired; entitled to vote. |
| --- | --- | --- |
| SVB II Claims | In full satisfaction of each allowed SVB II Claim, each Holder thereof will be entitled to the funds in the Cash Deposit Collateral Account, solely to the extent such funds have not been used prior to the Petition Date to offset any amounts owed by the Debtor to the SVB Lender. | Unimpaired; deemed to accept. |
| Escalate Claims | In full satisfaction of each allowed Escalate Claim, each Holder thereof will receive its respective allocation of the UPC Interests as set forth on the term sheet attached as **Annex III** hereto (the "**UPC Term Sheet**"). | Impaired; entitled to vote. |
| Noteholder Claims | In full satisfaction of each allowed Noteholder Claim, each Holder thereof will receive its respective allocation of the UPC Interests as set forth on the UPC Term Sheet. | Impaired; entitled to vote. |
| Ongoing Trade Claims | In full satisfaction of each allowed Ongoing Trade Claim, each Holder thereof will receive (i) cash in an amount equal to 50% of such Ongoing Trade Claim, to be paid on the Plan Effective Date and (ii) cash in an amount equal to 50% of such Ongoing Trade Claim, to be paid on or before the date that is 60 days after the Plan Effective Date (only to the extent not (a) already satisfied by payments made pursuant to an order of the Bankruptcy Court or (b) otherwise agreed between the Holder and the Debtor (with the reasonable consent of the Sponsor)); *provided* that such amounts will only be payable to such Holder if such Holder agrees to continue to provide goods and services to the Debtor on terms and conditions reasonably acceptable to the Debtor and the Sponsor. | Impaired; entitled to vote. |

| | | |
|---|---|---|
| **General Unsecured Claims** | In full satisfaction of each allowed General Unsecured Claim, each Holder thereof will receive its pro rata share of cash in an amount equal to $[●]⁷ (only to the extent not (a) already satisfied by payments made pursuant to an order of the Bankruptcy Court or (b) otherwise agreed between the Holder and the Debtor (with the reasonable consent of the Sponsor)). | Impaired; entitled to vote. |
| **Existing Equity** | All Interests (including preferred stock and common stock) will be cancelled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Equity shall be entitled to any recovery or distribution under the Plan on account of such Interests. | Impaired; deemed to reject. |

18.    Consistent with the RSA, the Debtor anticipates filing the Plan and related disclosure statement (the "Disclosure Statement") within 14 days of the Petition Date.  The RSA contemplates the Plan will be confirmed and become effective on or before July 14, 2020 and, among other terms and conditions, requires compliance with the following milestones (the "Milesones") during the Debtor's Chapter 11 case:

| **Milestones** | The Debtor will implement the Restructuring in accordance with the following milestones (the "**Milestones**"): |
|---|---|
| | 1.    No later than April 30, 2020, the Restructuring Support Agreement shall be executed by the Consenting Creditors. |
| | 2.    No later than May 1, 2020, the Petition Date shall have occurred. |
| | 3.    No later than 3 business days following the Petition Date, the Debtor shall have obtained entry of the interim order or orders authorizing the use of cash collateral and debtor-in-possession financing (each, an "**Interim DIP Order**"). |
| | 4.    No later than 14 days after the Petition Date, the Debtor shall have filed the Plan, a related disclosure statement (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Disclosure Statement**"), and a motion seeking the simultaneous approval of the Disclosure Statement and the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**") and confirmation of the Plan. |
| | 5.    No later than 30 days following the Petition Date, the Debtor |

---

⁷ The Debtor expects that all existing trade claims will be classified as Ongoing Trade Claims and has yet to determine which claims, if any, will be classified as General Unsecured Claims.  Accordingly, the Debtor has not yet determined the amount to be distributed to holders of General Unsecured Claims.

|  | shall have obtained entry of the final order or orders authorizing the use of cash collateral and debtor-in-possession financing (each, a "**Final DIP Order**" and together with the Interim DIP Order, collectively, the "**DIP Orders**"). |
|---|---|
| 6. | No later than 60 days after the filing of the Plan, Disclosure Statement, and a motion seeking approval of the Disclosure Statement and Solicitation Materials and Plan confirmation, the Debtor shall have obtained entry of the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code, and an order confirming the Plan, which order shall be in form and substance reasonably satisfactory to the Sponsor (the "**Confirmation Order**"). |
| 7. | No later than the earlier of (a) 75 days following the Petition Date and (b) 15 days following the entry of the Confirmation Order, the Plan Effective Date shall have occurred. |

19. In order to implement a case schedule that complies with these Milestones, together with the Plan and disclosure statement the Debtor will be filing a motion requesting (i) conditional approval of the disclosure statement subject to final approval at the confirmation hearing, (ii) the approval of solicitation procedures, and (iii) the establishment of a confirmation schedule, including the scheduling of a confirmation hearing, on or before June 29, 2020. The proposed procedures and confirmation deadlines will be more fully discussed in the forthcoming solicitation procedures motion. To facilitate solicitation and ensure all known and unknown claims are treated under the Plan, the Debtor has also filed a First Day Motion requesting that a general bar date be set 30 days after the Petition Date.

20. Under the RSA, TAG has agreed to provide the debtor-in-possession financing necessary to fund the Debtor's operations, including the costs associated with the Debtor's bankrutpcy proceeding, pending consummation of the Plan. The proposed DIP financing is discussed in detail in the First Day Motion requested approval for debtor-in-possession financing and in section III.B below.

21.     The terms of the RSA were heavily negotiated by the Debtor, SVB, Escalate, the Noteholders, and TAG in the weeks preceding the Petition Date, and the terms embodied in the RSA and proposed Plan are the result of good faith, arms' length negotiations between sophisticated parties represented by experienced counsel.  In the exercise of the Debtor's business judgment, the Debtor believes that the terms of the RSA and the Plan are fair, equitable, and in the best interest of the Debtor's estate.  The Debtor's business judgment is supported by the fact that the Debtor's largest creditors have each agreed to the treatment contained in the Plan and the fact that all or substantially all of the Debtor's unsecured creditors will be paid in full.  The Debtor thus believes the Plan will maximize the value of the Debtor's estate for the benefit of all parties and further believes that there is no better alternative available to the Debtor.  Indeed, based on the Debtor's ongoing attempts to source additional financing and the dire economic impact of COVID-19, the Debtor believes that the most likely alternative to the Plan is an immediate liquidation.

**E.     Proposed Parallel Marketing of the Debtor's Assets**

22.     Based on the Debtor's experience seeking alternative financing, and in light of the unprecedented economic developments over the few months, the Debtor does not believe that there are any viable alternatives to the Plan.  Nonetheless, the Debtor intends to subject the restructuring transactions proposed in the Plan to a "market check" via a marketing process conducted concurrently with the solicitation and confirmation of the Plan.  Subject to Court approval, and consistent with the RSA, the Debtor has retained MMG Advisors, Inc. ("MMG") to assist the Debtor in marketing and soliciting competing bids for the stock in the reorganized Debtor.

23.     In connection with the marketing process, the Debtor will be filing a motion within 5 days of the Petition Date requesting the approval of bidding procedures, the scheduling of an auction, and the approval of certain stalking horse bid protections for TAG.  The Bid Procedures will be more fully discussed in the Bid Procedures motion, but the Debtor generally proposes that

the bidding procedures and solicitation procedures provide a parallel timeline for solicitation of competing bids and confirmation of the Plan.

### III. THE DEBTOR'S FIRST DAY MOTIONS

**A.    Introduction**

24.     In order to facilitate the transition into bankruptcy and minimize the adverse effects of the commencement of the Bankruptcy Case on its business, the Debtor has requested various types of relief in the First Day Motions, all of which are being filed concurrently with this Declaration.  I submit this Declaration in support of the following First Day Motions:

     i.     Debtor's Motion for Interim and Final Orders (i) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (iii) Authorizing the Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105(a), 362, 364(c), (d), and 507, (iv) Granting Liens and Superpriority Claims to the DIP Lender Pursuant to 11 U.S.C. § 364(c), (v) Modifying the Automatic Stay, and (vi) Scheduling a Final Hearing Pursuant to Bankruptycy Rule 4001 (the "DIP Motion") [Docket No. 13].

     ii.     Motion for Interim and Final Orders Authorizing Debtor to (i) Continue Use of Existing Cash Management System, (ii) Maintain Existing Bank Accounts, (iii) Continue the Use of Existing Business Forms, and (iv) Authorizing the Debtor's Bank to Honor Payment Requsts and Instructions (the "Bank Account Motion") [Docket No. 5];

     iii.     Motion for Interim and Final Orders Authorizing Debtor to Pay Pre-Petition Employee Wages and Compensation, Stylist Commissions, and Employee Benefits (the "Wage Motion") [Docket No. 8];

     iv.     Motion for Interim and Final Orders Authorizing the Debtor to Pay Prepetition Sales Taxes (the "Sales Tax Motion") [Docket No. 10]

     v.     Motion for Interim and Final Orders Authorizing Debtor to Honor Certain Prepetition Obligations to Customers and Continue Customer Programs (the "Customer Program Motion") [Docket No. 9];

     vi.     Motion for Interim and Final Orders (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (ii) Approving Procedures for Providing Adequate Assurance of Post-petition Payments, and (iii) Approving Debtor's Proposed Form of Adequate Assurance (the "Utility Motion") [Docket No. 7];

vii. Application to Retain and Employ MMG Advisors, Inc. in Connection with Proposed Sale of Debtor's Assets (the "MMG Application") [Docket No. 11];

viii. Motion for Entry of an Order Establishing Bar Date for Filing Claims and Approving Forms of Notice (the "Bar Date Motion") [Docket No. 12].[8]

25. I have reviewed each of the First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the relief sought in each of the First Day Motions: (a) is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption to their business operations; and (b) constitutes a critical element in achieving a successful reorganization of the Debtor.

**B.     The DIP Motion**

26. Under the RSA, the DIP Lender has agreed to provide the DIP Financing necessary to fund the Debtor's operations, including the costs associated with the Debtor's bankruptcy proceeding, pending confirmation and consummation of the Plan, provided that it receive a first-priority priming lien on all of the assets of the Debtor securing all amounts advanced by the DIP Lender. SVB has agreed to the DIP Financing and other aspects of the restructuring (including the use of cash collateral and the priming liens granted to the DIP Lender) in return for, among other things, SVB's receipt of the Third Party Cash Collateral and a lump sum payment from the Debtor in the amount of $1,000,000, plus interest if applicable under the terms of the RSA (the "SVB Setlement Payment").

27. The terms of the RSA were heavily negotiated by the Debtor, SVB, Escalate, the Noteholders, and TAG in the weeks preceding the Petition Date, and the terms embodied in the RSA (including the proposed DIP Financing from the DIP Lender) are the result of good faith,

---

[8] Any defined terms not otherwise defined below shall have the meaning ascribed to them in the applicable First Day Motion.

arms' length negotiations between sophisticated parties represented by experienced counsel. In the exercise of the Debtor's business judgment, the Debtor believes that the terms of the DIP Financing, particularly when viewed in the context of the RSA, are fair, equitable, and in the best interest of the Debtor's estate. The proposed financing will provide the Debtor with the liquidity it needs to restructure its business through Chapter 11 and provides a bridge to the Plan, which the Debtor believes will maximize the value of the Debtor's estate for the benefit of all parties.

28.     Based on my efforts to find alternative financing discussed above, I do not believe that there are any parties willing to provide financing on terms more favorable than those contained in the proposed financing, including financing in the form of unsecured credit allowable under Section 503(b)(1) or as an administrative expense under Section 364(a) or (b).

29.     Approval of the DIP Financing on the terms set forth in the DIP Loan Agreement will provide the Debtor with immediate access to funds necessary to pay current and ongoing operating expenses, including postpetition wages and stylist commissions, lease payments, and critical trade invoices for postpetition goods and services. Without access to sufficient funds to pay these costs, the Debtor cannot continue to operate. Cessation of operations would destroy the Debtor's value as a going concern to the detriment of all parties in interest, including the Debtor's employees and creditors. The DIP Financing is necessary in order to preserve the value of the Debtor's estate and to avoid the harm that would result from the termination and piecemeal liquidation of the Debtor's operations.

30.     As discussed, the Debtor does not currently have sufficient cash flow or liquidity to fund its operations and has not been able to obtain DIP financing on more favorable terms. After several weeks of arms' length negotiation with the DIP Lender, the Debtor believes in the exercise of its business judgment that the terms of the DIP Financing, including the effective conversion of

a portion of SVB's prepetition secured claim into a postpetition administrative claim, are fair and reasonable and are the most favorable terms the Debtor could obtain under the circumstances. In return for the SVB Settlement Payment, which is substantially less than the aggregate amount of the SVB Obligations, SVB has consented to a priming lien in favor of the DIP Lender, which was a requirement of the DIP Lender to provide the DIP Financing. Absent the SVB Settlement Payment, the Debtor would have either had to bear the expense and uncertainty of a priming fight with SVB, the outcome of which could have derailed the Debtor's reorganization from the start.

31.     In addition, the case milestones were heavily negotiated and the DIP Lender would not have agreed to the DIP Financing without the inclusion of the case milestones. The Debtor believes the case milestones are reasonable under the circumstances and achievable.

32.     Accordingly, I believe the DIP Financing on the terms set forth in the DIP Loan Agreement is appropriate and in the best interest of the Debtor's estate.

## C.     The Bank Account Motion

33.     In the ordinary course of business, the Debtor utilizes a cash management system (the "Cash Management System") to collect and transfer the funds generated by the Debtor's operations and to disburse funds to satisfy the Debtor's financial obligations. As part of the Cash Management System, the Debtor maintains 4 accounts at Silicon Valley Bank ("SVB"): (i) an operating account (6832) from which the Debtor generally funds its operations (the "Operating Account"); (ii) a zero-balance payables account (6847) from which the Debtor remits payments and funds payroll (the "Payables Account"); (iii) a cash sweep account (3550) into which funds in the Operating account over a daily balance of $250,000 are automatically transferred (the "Sweep Account"); and (iv) a collateral deposit account (8362) that holds a $300,000 cash deposit to collateralize a letter of credit supporting a bond issued by Avalon Risk Management for the benefit

of UPS, which pays import duties for the Debtor's products on the Debtor's behalf (the "Collateral Account") (collectively, the "Existing Bank Accounts").

34.     The Debtor funds its operations with daily deposits into the Operating Account from SVB and AmEx merchant services, which consists of revenue generated by sales, and periodic deposits into the Operating Account by SVB, which consists of advances on the Debtor's revolving line of credit.  The funds are transferred as needed from the Operating Account to the Payables Account to fund scheduled payments.  The Debtor generally makes payments to vendors by both checks and wires issued weekly, with payroll and stylist commissions funded on a weekly, bi-weekly, and monthly basis.  This Cash Management System is overseen and operated by the Debtor's financial personnel in Dallas, Texas.

35.     The Cash Management System and the Existing Bank Accounts facilitate the Debtor's cash monitoring, forecasting and reporting, and enable the Debtor to efficiently collect, transfer, and disburse funds generated by its business operations.  Maintenance of the existing Cash Management System in the ordinary course of the Debtor's business will facilitate the Debtor's transition into bankruptcy and will avoid any unnecessary disruption to the Debtor's operations, including the difficulties in timely receiving payments and making disbursements to vendors and employees.  Accordingly, the Debtor requests authority to continue the collection, concentration, and disbursement of cash pursuant to the Cash Management System described above, including the ability to continue making certain payments by ACH or wire transfer consistent with the Debtor's prepetition practice.

36.     As described above, the Cash Management System is used for the purpose of collecting and distributing payments in the course of the Debtor's operations.  Requiring the Debtor to set up new accounts and notify and coordinate with counterparties regarding the change

would unnecessarily interrupt the Debtor's collection and disbursement of funds. Maintaining the Existing Bank Accounts and designating them as a debtor-in-possession accounts will preserve business continuity and avoid the disruption to the Debtor's collection and disbursement procedures that would necessarily result from closing each Existing Bank Account and opening a new account.

37.     Accordingly, I believe the relief requested in the Bank Account Motion is in the best interest of the Debtor's estate, is necessary to avoid immediate and irreparable harm, and should be approved.

**D.     The Wage Motion**

Employee Wages and Salary

38.     As set forth above, the Debtor had 41 employees as of the Petition Date, plus 10 on furlough. The Debtor's hourly employees are paid weekly and the Debtor's salaried employees are paid bi-weekly, both on Fridays. The Debtor pays its employees 2 weeks in arrears. The Debtor's weekly and bi-weekly payroll is processed through Paylocity, which debits the Debtor's payables account on the Thursday preceding payday.[9] The Debtor's employees are paid via direct deposit. As of the Petition Date, the Debtor's average weekly and biweekly payroll obligations, including applicable tax obligations, were approximately $6,000 and $147,000 per pay period, respectively.

39.     The Debtor is current on all prepetition weekly and bi-weekly payroll obligations. The Debtor's next paydays are May 1, 2020, which covers hourly wages earned during the period from April 20, 2020 to April 26, 2020, and May 8, 2020, which covers hourly wages earned during the period from  to April 27, 2020 to May 3, 2020 and salary earned during the period from April

---

[9] The Debtor transfers funds sufficient to cover each payroll from its operating account to its payables account prior to the debit by Paylocity.

25, 2020 to May 8 2020. Each of these next 2 paydays thus includes amounts owed to employees for work performed prior to the Petition Date.

40. Prior to the Petition Date, the Debtor fully funded and prepaid the amounts owed for the May 1, 2020 payroll. The aggregate payroll obligation for May 1, 2020 was $6,287.56. Because the May 1, 20202 payroll was prepaid, the Debtor does not believe there will be any post-petition transfer on account of prepetition obligations in connection with the May 1, 2020 payroll. Nonetheless, in an abundance of caution, the Debtor seeks approval of its May 1, 2020 payroll as well as its May 8, 2020 payroll. The Debtor estimates that its gross payroll obligation on May 8, 2020, will be $148,006.23. The Debtor seeks authority to pay these amounts, plus any additional outstanding amounts owed as of the Petition Date for accrued and unpaid wages and salaries (the "Employee Wages"), in the ordinary course of business.

Stylist Commissions

41. The Debtor's stylists are independent contractors who are compensated pursuant to a career plan that calculates commissions based on stylist's personal and team sales based on both sales volume and level of experience.[10] Commissions are earned on a monthly basis and are paid on the 15th day of the following month. Commissions are calculated and processed via the Debtor's point-of-sale software and paid via a direct debit to the Debtor's payables account on the 12th or 13th day of each month. As of the Petition Date, the Debtor is current on all stylist commissions. The Debtor's next stylist payday is May 15, 2020, which cover sales from April 1, 2020 to the Petition Date. The total amount of prepetition commissions owed as of the Petition Date is $503,558.09. The Debtor seeks authority to pay these amounts, plus any additional outstanding

---

[10] The Debtor will provide the United States Trustee and the Court with a copy of the career plan outlining the Debtor's commission structure upon request.

amounts owed as of the Petition Date for accrued and unpaid stylist commissions (the "Stylist Commissions"), in the ordinary course of business

Insurance and Related Benefits

42.     The Debtor provides all regular, full time employees (which does not include stylists) and their eligible dependents with access to group health, vision, and dental insurance plans, a prescription medication plan, short- and long-term disability insurance, and life insurance (collectively the "Insurance Benefits").  The Debtor's health insurance plan is administered by United Healthcare and the remainder of the benefit programs are administered by Mutual of Omaha, with the exception of the prescription drug program, which is administered by OptumRx.

43.     With respect to health insurance, the Debtor funds 75% of the cost of the monthly premiums for employees with the remaining 25% funded by participating employees through payroll deductions.  The approximate monthly cost of the Debtor's health insurance program is between $28,000 and $37,000 per month.   The Debtor's health insurance premiums are fully paid through May 2020.  The Debtor's next premium payment for the health insurance premiums in the amount of $28,000 is due on June 1, 2020 for the month of June.  Accordingly, there are no unpaid prepetition amounts owed in connection with the Insurance Benefits.  The Debtor seeks authority to continue providing these health insurance benefits in the ordinary course of business.

44.     The Debtor also provides dental, vision, short- and long-term disability insurance, and life insurance.  Employees pay 100% of the premiums for dental, vision, and voluntary life insurance via payroll deductions and the Company pays 100% of the premiums for short- and long-term disability.  The Debtor's approximate monthly obligation with respect to these insurance programs is $5,000 paid monthly on the first day of each month.  The Debtor has prepaid its

premium for April, and thus owes no prepetition amounts, but seeks authority to continue providing these benefits in the ordinary course of business.

45. The Debtor also provides employees with access to employee health savings accounts and flexible spending accounts (the "HSA/FSAs"). The Debtor's HSA/FSAs permit eligible employees to contribute funds on a pretax basis, subject to an annual cap, to accounts used to pay qualifying medical expenses throughout the year. The HSA/FSAs are administered by Optum Bank and funded via deductions from employees' weekly and biweekly pay. The Debtor does not incur any direct costs in connection with the maintenance of the HSA/FSAs, which are funded entirely by employee payroll deductions. The Debtor seeks authority to continue maintaining the HSA/FSAs in the ordinary course of business.

<u>Vaction and Paid Time Off</u>

46. All regular, full time employees of the Debtor are eligible for vacation and paid time off (collectively the "PTO") based on length of employment. Generally, the Debtor's employees accrue 10 days of PTO during their first year of employment, 13 days of PTO during their second and third years, 18 days of PTO during their fourth through sixth years, and 23 days of PTO per year after seven years of employment. Unused PTO is rolled over into the next calendar year, but employees' accrual of unused PTO is capped at 20 days per year. Employees are also eligible for limited paid time off for personal matters, funerals, voting, and jury duty. Unused accrued PTO is not payable upon the employees' resignation or termination.

47. The Debtor requests authorization to continue its PTO policy post-petition and to honor PTO liabilities to its employees that may have arisen prior to the Petition Date. Because unused PTO is not payable upon resignation or termination, the Debtors do not track the outstanding PTO liability. However, the Debtor anticipates that many employees will continue to

use accrued PTO in the ordinary course of business without causing any material cash flow requirements beyond the Debtor's normal payroll obligations. The Debtor requests authority to continue to pay all PTO obligations in the ordinary course.

Retirement Benfits

48.     The Debtor also maintains a company 401k plan (the "401k Plan") for certain eligible employees. The 401k program is administered by Vanguard. Employee contributions are processed with each payroll and deducted from participating employees' paycheck. On paydays, Vanguard draws employee contributions directly from the Debtor's payables account. The Debtor does not match employee contributions. Because 401k contributions are funded directly by employees, the Debtor does not incur any direct funding obligations but requests authority to continue administering the 401k plan in the ordinary course of business.

Expense Reimbursement

49.     The Debtor occasionally reimburses certain business-related expenses incurred by employees incurred in the scope of their employment, some of which may have been incurred but not yet reimbursed as of the Petition Date (collectively, the "Reimbursable Expenses"). The Debtor's employees incur such expenses in reliance upon the understanding that such expenses will be reimbursed. Failure to reimburse employees for the Reimbursable Expenses would impact employee morale and cause them financial hardship

50.     In order to be reimbursed, employees are required to submit receipts for qualifying Reimbursable Expenses to their manager on a weekly basis. Upon the manager's approval, Reimbursable Expenses are paid via checks processed on a weekly basis as part of the Debtor's ordinary course accounts payable. The Debtor does not believe there are any Reimbursable Expenses owed to employees as of the Petition Date. Nevertheless, because additional

Reimbursable Expenses may have been incurred but not reported as of the Petition Date, the Debtor

seeks authority to pay all Reimbursable Expenses in the ordinary course of business.

51. To maintain the continuity of the Debtor's business operations, to ensure the

Debtor's network of stylists continues selling the Debtor's products, and to preserve the morale of

employees, it is important that the Debtor be permitted to pay the Prepetition Obligations at its

discretion in the ordinary course of business. If employees and stylists do not receive payment for

work performed prepetition, it is likely that the Debtor will lose a significant number of its

employees and stylists with little or no notice. Moreover, many of the Debtor's employees and

stylists live paycheck to paycheck and would suffer severe adverse consequences if they failed to

receive their full compensation.

52. Likewise, the Debtor would suffer immediate and irreparable harm as a result of

any resulting loss of morale, exodus of employees, disruption to its operations, decreased sales,

and damage to customer goodwill. The Debtor's ability to continue operating is largely contingent

on its network of stylists and their willingness and ability to continue marketing and selling the

Debtor's products, which in turn depends on the support network and infrastructure maintained by

the Debtor's employees. Honoring the Prepetition Obligations will minimize the hardship that

employees and stylists will certainly endure if payroll is interrupted and will prevent the wholesale

loss of employees and stylists that would ensue if they lost the reasonable expectation that they

will be paid for their work. Accordingly, I believe that it is in the best interest of its estate to honor

the Prepetition Obligations.

53. The Debtor has determined that all of the Prepetition Obligations attributable to

employee wages are entitled to priority under sections 507(a)(4) and (a)(5) and no employee is

owed more than $13,650 with respect to unpaid wages.[11]  Similarly, the Debtor believes that some of the Prepetition Obligations attributable to stylists qualify as priority claims under Section 507(a)(4)(B), which provides for priority payment up to $13,650 for commissions earned by independent contractors in the 12 months prior to the Petition Date.  While the Debtor has not been able to confirm that the commissions owed to each of the Debtor's 1,800+ independent stylists satisfy the specific criteria of Section 507(a)(4)(B),[12] it reasonably believes that many of the commissions do meet the criteria and has determined that only 1 stylist is owed more than $13,650.[13]

54.    The payment of the Prepetition Obligations is necessary to prevent the risk of damage to the Debtor's estate, which would adversely affect all parties in interest.  In this case, the continued services and cooperation of the Debtor's employees and stylists is integral and necessary to a successful reorganization because, without continued sales of its products, the Debtor will have no revenue and will be unable to reorganize.  In addition, the Debtor's stylists spend years building a client base.  The loss of stylists and their existing clients would be extremely and irreparably detrimental to the Debtor's estate.  Thus, maintaining the Debtor's current workforce is essential to the Debtor's ability to continue operations.

55.    If the Debtor is unable to assure its employees and stylists that they will be paid timely, or if employees and stylists are not immediately assured of uninterrupted, critical payments to which they are entitled, the Debtor's post-petition operations would be seriously jeopardized

---

[11] Certain of the Debtor's employees are owed deferred compensation in excess of the statutory cap.  However, the Debtor does not seek authority to pay such deferred compensation at this time.

[12] I understand that Section 507(b)(4)(B) provides that an independent contractor's commissions earned from the sale of a debtor's goods are entitled to priority treatment if, during the preceding 12 months, at least 75 percent of the amount that the independent contractor earned by acting as an independent contractor in the sale of goods or services was earned from the debtor.  As of the Petition Date, the Debtor has not been able to verify each stylist's annual income from all sources.

[13] The amounts owed to one stylist exceed the statutory cap by $334.16.

due to employee resentment, resignations, loss of sales and good will, and damage to the Debtor's marketshare. The Debtor has not identified a practical or legal alternative to payment of the Prepetition Obligations that would not result in a significant disruption of its business and harm to the estate. Because the potential harm and economic disadvantage that would result from the Debtor's failure to pay the Prepetition Obligations is grossly disproportionate to the amount of any pre-petition claim that may be paid, I believe that each prong of the *Coserv* test discussed in the Wage Motion is satisfied in this case.

**E.     Sales Tax Motion**

56.     As discussed above, the Debtor is in the direct-to-consumer men's clothing business, with a nationwide direct sales network that yields sales in all 50 states. In the ordinary course of its business, the Debtor is required to collect sales taxes from customers (the "<u>Sales Taxes</u>") and remit those taxes to state taxing authorities (the "<u>Taxing Authorities</u>") on a monthly basis. The Sales Taxes are calculated and collected from customers at the point of sale. The Debtor contracts with Baker Tilly Virchow Krause, LLP ("<u>Baker Tilly</u>") to audit the Debtor's monthly sales, file the necessary tax returns in each jurisdiction in which the Debtor owes Sales Taxes, and remit payments to the Taxing Authorities. The Debtor pays the Sales Taxes via Baker Tilly no later than the 15th day of each month. As of the Petition Date, the Debtor was current on all Sales Tax obligations through March 2020 and estimates that its prepetition Sales Tax obligation for the period April 1 through the Petition Date is $134,596.34. The Debtor's Sales Taxes for April 2020 are due on or before May 15, 2020.

57.     Payment of the Sales Taxes is critical to the Debtor's ability to continue operating. As an initial matter, in order to continue operating and making sales the Debtor must deal with the Taxing Authorities and there is no alternative to payment of the Taxing Authorities' claims. Further, the non-payment of the Sales Taxes could cause the Taxing Authorities to take precipitous

action by, *inter alia*, conducting audits, filing liens, pursuing payment of Sales Taxes from the Debtor's directors, officers, and other employees, and seeking to lift the automatic stay, all of which would disrupt the Debtor's operations and impose significant cost upon the Debtor's estate. In addition, many federal and state statutes hold officers and directors of collecting entities personally liable or criminally responsible for certain taxes owed by those entities. To the extent that any Sales Taxes remain unpaid by the Debtor, its officers and directors could be subject to lawsuits or criminal prosecution. Prompt payment of the Sales Taxes will avoid these unnecessary and potentially costly governmental actions. I therefore believe that the *CoServ* factors discussed in the Sales Tax Motion are satisfied and payment of the Sales Taxes is appropriate.

**F.      Customer Program Motion**

58.      The Debtor sells custom, made-to-measure menswear that is designed and offered by the Debtor but manufactured by third parties. When buying the Debtor's products, customers pay 100% of the cost at the time of purchase. The Debtor then arranges for the product to be manufactured and delivered to the customer. Because the Debtor's sales are all prepaid, as of the Petition Date the Debtor was indebted to customers for sales that were made prepetition but had not yet been delivered. The approximate amount of prepaid, undelivered sales as of the Petition Date was $1,604,413.71 (the "Prepaid Sales").

59.      In the ordinary course of business, the Debtor also sells gift cards to customers that may be redeemed dollar-for-dollar for the Debtor's merchandise. As of the Petition Date, the balance of valid outstanding gift cards sold by the Debtor was $1,088,162.40 (the "Gift Cards").

60.      In addition, the Debtor accepts returns and exchanges of its products within 90 days of purchase and also provides a warranty for the materials and workmanship of its garments. In the ordinary course of its business, the Debtor refunds approximately 2.8% of its sales and exchanges or remakes approximately 6.5%. As a result, as of the Petition Date the Debtor has

incurred actual and potential obligations to refund, alter, exchange, or remake purchases made prepetition. Based on recent sales, the Debtor estimates its approximate potential refund and exchange obligation to be approximately $199,080.17 (the "Refunds and Exchanges").

61. The Debtor also occasionally runs sales promotions and offers discounts to increase overall sales activity. As of the Petition Date, the Debtor was providing an ongoing sales event (the "Sales Event") which provided customers with savings depending on the total amount spent. Specifically, the Sales Event provided customers with a discount of $100 on purchases of $500 and above, $200 on purchases of $1000 and above, and $300 on purchases of $1,500 and above. From time to time, the Debtor may offer additional promotional programs such as the Sales Event (collectively the "Sales Promotions").

62. The Debtor also offers a sales-based customer loyalty program that provides customers access to certain additional services based on their volume of purchases (the "Loyalty Program"). For example, a customer with sufficient status in the customer loyalty program is eligible to order suits with working buttonholes on the cuffs or pick stitching detail. The Debtor believes the aggregate amount of liability or obligations it incurs with respect to the Loyalty Program are not material.

63. As a direct sales business, the goodwill and loyalty of the Debtor's customers and potential customers is paramount. Continuation the Customer Programs in the ordinary course of the Debtor's business is essential to maintaining consumer goodwill and loyalty and ensuring the Debtor's ability to generate additional sales. Likewise, failure to honor prepetition obligations to customers, including the delivery of the Prepaid Sales, honoring the Gift Cards, and processing the Returns and Exchanges would severely damage the Debtor's reputation and impair its ability to attract new customer and to make sales. I do not believe there are any practical or legal

alternative to honoring the prepetition obligations associated with the Customer Programs that would avoid this certain harm to the Debtor's estate. The Debtor's continuation of the Customer Programs and the payment of the prepetition obligations related to the Customer Programs is necessary to maximize the value of the Debtor's estate and is therefore in the best interest of all parties. Based on the foregoing, I believe each of the *CoServ* factors discussed in the Customer Programs Motion is satisfied.

### G. The Utility Motion

64.     The Debtor maintains, among other facilities, a corporate headquarters and a fitting a sales studio in Dallas, Texas and a warehouse facility in Carrollton, Texas. In the ordinary course of business at these facilities, the Debtor uses gas, water, electric, telephone, and other utility services provided by various utility providers (each a "<u>Utility</u>" and collectively the "<u>Utilities</u>") at each of these locations. A list identifying each Utility currently providing service to the Debtor is attached to the Utility Motion as **Exhibit B**.

65.     As with most businesses, uninterrupted utility service is critical to the Debtor's ability to maintain its ongoing operations. In this case, termination of services by the Utilities would preclude the Debtor from operating its corporate headquarters and distribution warehouse, resulting in significant losses and irreparable harm to the Debtor's estate. Accordingly, I believe the relief requested in the Utility Motion is in the best interest of the Debtor's estate and should be approved.

### H. MMG Application

66.     In order to ensure that the Plan represents the highest and best offer for the Debtor's assets, the Debtor proposes to run a parallel marketing process while soliciting acceptances of the Plan. MMG is a leading investment bank for middle-market consumer product, retail and fashion companies. The Debtor initially contacted MMG in early 2020. MMG visited the Debtor's offices

in Dallas in February 2020 to learn more about the Debtor's business. In April 2020, the Debtor decided to engage MMG in connection with its restructuring efforts to assist with the marketing and sale of the company's assets.

67. MMG's investment banking and advisory services will be integral to the Debtor's efforts to sell its assets via a competitive bidding process and to confirm a plan of reorganization. Among other things, MMG will assist the Debtor with the post-petition marketing of the Debtor's assets, establishing and implementing bidding procedures, soliciting and evaluating the bids from potential purchasers, and running an auction process in order to facilitate the approval and consummation of a sale of the Debtor's assets.

68. The Debtor proposes to engage MMG to evaluate the Debtor's strategic alternatives and provide investment banking and advisory services in connection with a potential sale of the Debtor's assets pursuant to the terms of the engagement letter agreement attached to the MMG Application as **Exhibit C** (the "Agreement"). The Debtor believes that compensation provided for in the Agreement is reasonable and that MMG's involvement in the Debtor's existing knowledge of the Debtor's assets and operations will inure to the Debtor's benefit in pursuing a sale and will assist the Debtor in fulfilling its duties in this chapter 11 case and confirming a plan of reorganization. Given the significant amount of time and resources MMG has already devoted to the marketing and sale of the Debtor's assets, the Debtor believes the fee structure is reasonable under the circumstances.

## I.    Bar Date Motion

69. The Debtor will be filing its schedules and statement of financial affairs within a few days of the Petition Date. The Debtor believes the schedules will accurately reflect all known claims and list all parties in interest. The Debtor also expects that the Plan will provide for either agreed treatment or payment in full to all known creditors. However, to ensure that the Plan

addresses all potential claims, including any unknown claims, and to ensure that all creditors receive notice of the Plan and the confirmation hearing, the Debtor seeks to establish a bar date prior to (or concurrently with) the solicitation of votes and procedures to provide parties in interest with notice of the bar date.

70.     The Debtor submits that the proposed notice procedures are sufficient to provide both known and unknown creditors adequate notice of the Bar Dates.  Through the process of completing the Schedules, the Debtor has identified those persons and entities that are known to the Debtor to hold claims against the Debtor or are likely to be potential holders of claims.  The potential claimants were identified following careful review of the Debtor's books and records. The Publication Notice that the Debtor will publish has been tailored to provide notice of the Bar Dates on an extensive basis throughout the United States.  The Debtor believes that the Publication Notice is reasonably designed to provide any claimants unknown to the Debtor that may potentially hold claims against the Debtor with adequate notice of the Bar Dates.  Accordingly, I believe the Bar Dates and related notice procedures requested in the Bar Date Motion are reasonable under the circumstances and should be approved.

## IV. CONCLUSION

71.     The relief sought in the First Day Motions will ensure that the Debtor transitions into Chapter 11 with as little disruption as possible.  More specifically, the relief requested in the First Day Motions is necessary in order to permit the Debtor to (i) obtain the financing necessary to continue its operations, (ii) continue making and receiving payments without interruption, (iii) compensate employees and stylists, (iv) satisfy unpaid tax obligations, and (v) fulfill sales and related obligaitons to customers.  The Debtor's inability to continue any one of these functions in the ordinary course of business would cause immediate and irreparable harm to the Debtor's estate

in the form of, among other things, lost sales, damage to customer good will, and inability to obtain and deliver inventory. For this reason, the relief sought in the First Day Motions is critical to the Debtor's operations and necessary to avoid immediate and irreparable harm to the Debtor's estate.

72. I declare under penalty of perjury that the foregoing is true and correct.


Dated: May 2, 2020                                     */s/Dave DeFeo*
                                                       Dave DeFeo
                                                       Chief Executive Officer
                                                       J. Hilburn, Inc.